## Case No. 2,545.

**CENTENNIAL BOARD OF FINANCE v. PATTERSON, et al.**

[34 Leg. Int. 29; 3 Wkly. Notes Cas. 307; 15 Alb. Law. J. 106; 2 Cin. Law. Bul. 7; 24 Pittsb. Leg. J. 107.] [1]

Circuit Court, E. D. Pennsylvania. Jan. 19, 1877. [2]

CENTENNIAL EXHIBITION OF 1876—APPROPRIATION BY THE UNITED STATES—REPAYMENT.

The act of congress of February 16, 1876 [19 Stat. 4], appropriating $1,500,000 to the Centennial Exhibition, does not provide that the said sum shall be repaid to the United States before the stockholders of the said exhibition shall be repaid the amount subscribed for their stock. It only provides that it shall be repaid before any dividend or percentage of profits is paid to the stockholders.

[See note at end of case.]

[In equity. Bill by the Centennial Board of Finance against Joseph Patterson, Henry Lewis, John Gill, George Eyster (assistant treasurer of the United States at Philadelphia), the National State Bank of Camden, the International Exhibition Company, and the State of New Jersey, to determine the

---

[1] [Reprinted from 34 Leg. Int. 29, by permission. 15 Alb. Law J. 106, gives syllabus only.]

[2] [Reversed by the supreme court in Eyster v. Board, 94 U. S. 500.]

disposition of moneys remaining in its hands.]

Wm. Henry Rawle, for Centennial Board of Finance.

B. Williamson, for the state of New Jersey.

Robert N. Willson, for International Exhibition Co.

John K. Valentine, Dist. Atty., for the United States.

STRONG, Circuit Justice. This is a bill for an interpleader. The complainants have in hand the sum of about $2,000,000, of which they are trustees for distribution, and to which there are conflicting claims. The state of New Jersey, the International Exhibition Company, Joseph Patterson, and numerous other private persons, are stockholders of the corporation created by the act of congress of June 1, 1872 [17 Stat. 203], under the name of the "Centennial Board of Finance," and they claim that the whole fund should be distributed among the stockholders. On the other hand, the United States, represented by the assistant treasurer, claim that, before any payment to the stockholders, the sum of $1,500,000 should be paid into the United States treasury. The case is a proper one for the adjudication of this court. The parties litigant are before us, and they have answered the bill, asserting their claims. Though all the stockholders are not parties of record, they are all represented, and the United States has submitted the matter in dispute to our determination.

The rights of the contending parties grow out of several acts of congress to which we shall refer. On the 3d of March, 1871 [16 Stat. 470], an act was passed by the preamble of which it was declared, that it behooved the people of the United States to celebrate by appropriate ceremonies the centennial anniversary of the Declaration of Independence, and that it was fitting the completion of the first century of our national existence should be commemorated by an exhibition of the natural resources of the country and their development, and of its progress in those arts which benefit mankind, in comparison with those of other nations, and that as the exhibition should be a national celebration, in which the people of the whole country should participate, it should have the sanction of the congress of the United States. It was therefore enacted that a commission, consisting of not more than one delegate from each state and territory, should be appointed by the president of the United States, on the nomination of the governors of the states and territories respectively, whose duty it should be to prepare and superintend the execution of a plan for holding the exhibition in Philadelphia. The commission was also required to report to congress a suitable date for opening and closing the exhibition, a schedule of appropriate ceremonies, a plan or plans of the buildings, a complete plan for the reception and classification of articles intended for exhibition, and the requisite customhouse regulations for the introduction into the country of the articles from foreign countries intended for exhibition. Provision was also made for notice to the diplomatic representatives of foreign nations, and of the regulations that might be adopted by the commissioners by a proclamation of the president, in order that the time and place of holding the exhibition, and the regulations therefor, might be published in their respective countries. This act, though it declared the United States should not be liable for any expenses attending the exhibition, or by reason thereof, plainly recognized it as a national celebration, in which the whole country should participate, and gave to it the sanction of congress. 16 Stat. 470. It was followed by another act, approved June 1, 1872 (17 Stat. 203), which, after premising that such provision should be made for procuring the requisite funds, as would enable all the people of the United States to aid in the preparation and conduct of the exhibition and memorial celebration, created the complainants a body corporate, to be known as "The Centennial Board of Finance," to continue to have corporate existence until the object for which it was formed should be accomplished. The corporators were taken from every state and territory. A capital stock, not exceeding $10,000,000, divided into shares of $10 each, was authorised, and stock certificates, prepared by the secretary of the treasury, were directed to be issued to the subscribers for the stock. The proceeds of all such subscriptions were ordered to be used for the expenditures required in carrying out the objects of the act of March 3, 1871; and the corporation was empowered to borrow money, to issue bonds therefor, not in excess of its capital stock, and to secure the payment of the same, principal and interest, by mortgage upon its property and prospective income. By the 10th section it was enacted "that, as soon as practicable after the said exhibition shall have closed, it shall be the duty of said corporation to convert its property into cash, and, after the payment of all its liabilities, to divide its remaining assets among its stockholders, in full satisfaction and discharge of its capital stock;" and it was made the duty of the Centennial Commission to supervise the closing up of the affairs of the corporation, to audit its accounts, and to submit to the president a report of the financial results of the Centennial Exhibition. Thus, it plainly appears, not only that the exhibition was a national one, set on foot and sanctioned by congress, but that the Centennial Commission and the Centennial Board were made the agents of the government in preparing and conduct-

ing it. Under this legislation the corporation was authorised, and stock subscriptions, for which certificates were issued, to the amount of about $2,400,000 were made, which are still outstanding. The subscriptions were made in reliance upon the provisions of the act of congress. The number of subscribers was very large, and they are scattered all over the United States, holding the stock in various amounts, from one share to ten thousand; the number held by the state of New Jersey.

Such had been the action of congress, and such were the rights of stockholders when the act of February 16, 1876 [19 Stat. 4], was enacted, out of which arises the controversy in this case. Its preamble is significant. After referring to the act of March 3, 1871, and the act of June 1, 1872, and after reciting that the president of the United States in compliance with a joint resolution of congress, approved June 5, 1874 [18 Stat. 53], had extended to foreign nations, in the name of the United States, an invitation to take part in the international exposition to be held in Philadelphia, under the auspices of the government, and after reciting that the governments so invited, to the number of thirty-eight, had accepted the invitation, and were making extensive preparations to embrace the courtesy so extended to them, "thereby rendering proper arrangements for the coming ceremonies, on the part of the government of the United States, a matter of honor and good faith," the preamble asserted that the preparations designed by the United States Centennial Commission, and in part executed by the Centennial Board of Finance, were in accordance with the spirit of the acts of congress relating thereto, and on a scale creditable to the government and people of the United States. It was therefore enacted as follows: "That the sum of $1,500,000 to complete the Centennial buildings and other preparations, be and the same is hereby appropriated out of any moneys in the United States treasury not otherwise appropriated. which shall be paid on the drafts of the president and treasurer of the Centennial Board of Finance, one-third immediately after the passage of this act, and the remainder in four equal monthly payments, provided, that in the distribution of any moneys that may remain in the treasury of the Centennial Board of Finance, after the payment of its debts, as provided for, by the tenth section of the act of congress, approved June 1, 1872, incorporating said Centennial Board of Finance, the appropriation hereinbefore made shall be paid in full into the treasury of the United States, before any dividend or percentage of the profits shall be paid to the holders of said stock. Provided, also, that the government of the United States shall not, under any circumstances, be liable for any debt or obligation of the United States Centennial Commission or the Centennial Board of Finance, or any payment in addition to the foregoing sum."

The appropriation was avowedly made to complete the necessary preparations for a celebration and exhibition which congress had declared national, and under its sanction, in which other nations had been invited by the government to join, and the proper arrangements for which the preamble to the act declared to be a matter of honor and good faith on the part of the government of the United States. It was, therefore, meeting at least an honorable obligation, and that it was so considered may be inferred from the closing words of the section, which declared the United States should not be liable for any obligation or payment "in addition to the sum" appropriated. A careful inspection of this act, under which alone the United States asserts a claim to any portion of the funds in the hands of the complainants, makes it evident that congress did not intend thereby to create the relation of debtor and creditor between the Centennial Board of Finance and the United States. The language used is the ordinary language of an appropriation, not of a loan. No evidences of debt were required from the board. Bonds were not exacted for the return of the money, though by the act of 1872 the board was empowered to borrow money and give bonds therefor, and though the president of the board was required by the second section of this act to execute a bond with sufficient security in the sum of $500,000, conditioned for the safe-keeping and faithful disbursement of the sum appropriated. Were it not for the proviso relative to the distribution of any moneys that might remain in the treasury of the board, or (as they are called in the act of 1872) "remaining assets," after the payment of all its liabilities, there could be no pretence that the act was anything more than a mere appropriation demanded by the honor and good faith of the government. But even the proviso repels the idea that the board became a debtor by receiving the sum appropriated. It reserves no right to the United States until the debts of the board shall have been paid. It is only "after the payment of its debts," not after the payment of its other debts, but after all its debts shall have been satisfied, that any payment into the treasury of the United States is required to be made. If the appropriation was intended to be a loan merely, it created a debt, and was demandable as such, without adding the words, "after payment of its debts." It would be an absurd meaning to attribute to congress that they intended to say that after the payment of its debts the board shall pay another one of its debts. And if it had been intended the board should be a debtor for the amount of the appropriation, but that its payment should be postponed till the other debts were paid, the language used would have been, "after its other debts

are discharged," or words equivalent. It seems plain, therefore, even from the reading of the proviso, that is was not the purpose of congress to assume for the government the position of a creditor. That was carefully avoided. Congress had in view the fact that at the close of the exhibition, its agent, the corporation, would wind up, and, after paying its debts, would distribute its remaining assets, and the proviso reserves nothing more than a right to be a possible distributee of a portion of those assets. It was not known how large they would be; whether they would suffice to repay what the stockholders had paid in, and profits on their investment, or not. It may have been supposed the exhibition would yield profits on the investment.

If then the appropriation was not intended to have the character of a loan, creating a debt of the board, and to be paid as a debt, the stockholders who subscribed for the stock have, by the tenth section of the act of 1876, a clear right to the "remaining assets," at least to the extent of their capital invested. The section enacted, as we have seen, that after the close of the exhibition it should be the duty of the board to convert its property into cash, and after the payment of all its liabilities (or debts as they are called in the act of 1876), to divide its remaining assets pro rata among its stockholders, in full satisfaction and discharge of its capital stock. The stockholders were thus entitled to a satisfaction of their stock out of whatever assets remained after the payment of the debts of the corporation. It is not to be assumed that congress intended to take away the right without the consent of the stockholders. The directors of the corporation could not bargain it away. And there are no words of repeal in the later act; nor is there any necessary implication of an intent to repeal. The proviso, therefore, must receive a construction, consistent, so far as possible, with the provisions of the act of 1872. Its direction is, that after the payment of the debts of the Centenial Board, the appropriation shall be paid in full, into the treasury of the United States before any "dividend or percentage of the profits shall be paid to the holders of the stock." What is meant by "dividend or percentage of profits"? It is observable that in all the legislation respecting the Centennial Exhibition, the word "profits" here first appears. In the act of 1872, the residue after payment of the liabilities, was called "remaining assets," and in a former part of this act it was called "moneys that remain." But when the fund is mentioned, to which the United States may resort, in case there is such a fund, it is called "profits." The phraseology is changed, and with it, we think, the meaning. So far as the United States has rights as a distributee, the subject for distribution is "profits," not "remaining assets," not capital. Before any dividend or percentage, or pro-

portion of the profits may be paid to the stockholders, the appropriation must be paid into the United States treasury. If there are no profits the government has no claim. Now, what are the profits of a corporation that has a capital stock? Very plainly, only what has been gained beyond the stock. They are always acquisitions beyond the investment or expenditures. Nobody would think a tax on the profits of a bank or an insurance company, or, indeed, of any corporation, was a tax on its capital, or a tax on its entire property, if that property had been converted into cash in the process of winding up. Congress, in the proviso, is speaking of the profits of a corporation, and it is to them, and them only, it sets up a claim. But in this case there were no profits. The assets remaining after the payment of debts, and now for distribution, are only remnants of the capital, and insufficient to return what the stockholders paid in. We think the word "dividend," as well as the word "percentage," points to profits and not to capital. They are synonyms, as here employed. That the word "dividend" is sometimes used to describe a distribution of capital may be admitted, but such an use is abnormal. It is more commonly used to denote a division of profits, and very evidently it was so employed in this proviso. It was not said dividend unqualifiedly, or dividend of the remaining assets, or dividend of moneys that remain after payments of debts, but it was used in connection with profits, "dividend or percentage of the profits—that is, as we understand the phrase, dividend, portion, or percentage of the profits." If it was intended to embrace a division of all the moneys remaining in the treasury of the board why were the words "or percentage of the profits" added? If the amount appropriated was meant to be paid before the stockholders could get anything, those added words were totally unnecessary and unmeaning. The introduction of the word "profits" could have had no other object than to designate the subject of the dividend or percentage. If it was intended to give the United States a prior claim on the entire remaining assets, it would have been sufficient to have said before any dividend or division shall be made among the stockholders—and we are not at liberty to say the added words have no meaning.

For these reasons, we are of the opinion that the fund in the treasury of the Centennial Board of Finance should be distributed pro rata among the stockholders of the corporation as directed by the tenth section of the act of 1872 [17 Stat. 210], and as it is insufficient to pay the stockholders the full amount invested by them as stockholders, as no part of it is made up of profits, the case contemplated in the proviso has not arisen, and the United States is entitled to no part of the funds. Let a decree be prepared accordingly.

And now, January 19th, 1877, this case having been heard upon the bill and answers, and having been argued by counsel, whereupon, in consideration thereof, it is ordered and decreed that the complainants do pay and distribute the fund in their hands to and among the several and respective stockholders of the complainant, pro rata, according to the true intent and meaning of the act of congress, approved the 16th day of February, 1876, and it appearing that the said fund is not sufficient to pay to the said stockholders the full amount invested by them, it is ordered that no part of the said fund be paid into the treasury of the United States. And it is further ordered that upon such payment and distribution among the said stockholders being made, the complainant do stand discharged of and from all liability in the premises. And it is further ordered that the costs in this cause be paid out of the said fund.

[NOTE. George Eyster, the assistant treasurer of the United States at Philadelphia, appealed from the decree of the circuit court. The supreme court reversed the decree, and held, per Mr. Chief Justice Waite, that the act of 1876 did not change the order of distribution provided by the act of 1872. and that consequently, on distribution of the assets of the board on the closing up of its affairs, the United States was entitled to repayment of the congressional appropriation of $1,500,000 before there could be any division of the assets among the stockholders. Eyster v. Board, 94 U. S. 500.]